IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ARCHER WESTERN - DE MOYA JOINT VENTURE, <br><br> Plaintiff, <br><br> v. <br><br> HDR ENGINEERING, INC. <br><br> and <br><br> JOSEPH LoBUONO, P.E. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Case No. _____ |

# COMPLAINT

Plaintiff Archer Western - de Moya Joint Venture ("CJV"), by and through its undersigned counsel, states as follows for its Complaint against Defendants HDR Engineering, Inc. ("HDR") and Joseph LoBuono, P.E. ("LoBuono") (together, "Defendants"):

## PARTIES

1. CJV is a joint venture comprised of Archer Western Contractors, LLC ("Archer Western") and The de Moya Group, Inc. ("De Moya").

2. Archer Western is a Delaware limited liability company whose members are all domiciled in the State of Illinois.

3. De Moya is a Florida corporation that maintains its principal place of business at 14600 SW 136 Street, Miami, Florida 33186.

4. Upon information and belief, HDR is a Nebraska corporation that maintains its principal place of business at 1917 S 67th Street, Omaha, Nebraska 68106.

5. LoBuono is an individual who, upon information and belief, is domiciled in the State of New Jersey and resides at 106 Foothill Road, Flemington, New Jersey 08822. At all times relevant hereto, LoBuono was a professional engineer licensed in the State of Florida.

## JURISDICTION AND VENUE

6. This Court has personal jurisdiction over Defendants pursuant to § 48.193(1) Fl. Stat. (2021) because this suit arises out of, and relates to, Defendants' contacts with Florida, including Defendants' having conducted business in Florida, having caused injury to persons or property within Florida by nature of service activities performed within Florida, and HDR's breach of a contract to be performed in Florida and which was governed by Florida law.

7. Upon information and belief, the Court also has personal jurisdiction over Defendants pursuant to § 48.193(2) Fl. Stat. (2021) because Defendants are engaged in substantial and not isolated activity within Florida.

8. This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between CJV and all Defendants and the amount in controversy exceeds the sum of $75,000.

9. This Court is the proper venue pursuant to 28 U.S.C. § § 1391(b)(2) and 1391(b)(3) because a substantial part of the events or omissions giving rise to CJV's claims occurred within the jurisdiction of this Court and a substantial part of the property that is the subject of this action is situated within the jurisdiction of this Court.

## FACTUAL BACKGROUND

10. This case arises out of the I-395/SR 836/I-95 Design-Build Project ("Project"), which is a design-build project to revitalize transportation infrastructure in the vicinity of downtown Miami, Florida. CJV seeks to recover approximately $155 million in compensatory

damages arising out of Defendants' gross negligence in designing a precast concrete bridge in connection with the Project.

## The Request for Proposals

11.  On or about February 6, 2017, the Florida Department of Transportation ("FDOT"), in conjunction with the Miami-Dade Expressway Authority ("MDX"), issued a Request for Proposals ("RFP") soliciting competitive proposals for design-build services on a project to enhance three major corridors in Miami, including State Road 836 (SR836), Interstate 95 (I-95), and Interstate 395 (I-395).

12.  The RFP generally contemplated that the awardee would perform road repairs, road widening, replacement of guardrails and barrier walls, asphalt and concrete replacement, repairs to ramp connections, and other improvements to specified roads and bridges in the Miami area.

13.  Additionally, the Project included the design and construction of a precast concrete segmental arch bridge on westbound/eastbound I-395, spanning more than 1,000 feet and located directly above the portion of Biscayne Boulevard known as the Heritage Trail ("Signature Bridge").

14.  The Heritage Trail is a multi-use public trail located in a densely populated area of Miami and has, historically, been heavily utilized by walkers, joggers, hikers, skaters, bikers, fishers, boaters, and sightseers.

15.  The RFP included a set of concept plans and reference documents intended to convey FDOT's design objectives for each component of the Project, including FDOT's proposed dimensions and aesthetics for the Signature Bridge.

16.  The RFP required offerors to submit aesthetic design concepts for the Signature Bridge, for review and approval by FDOT's Aesthetic Review Committee.

17. The RFP further required offerors to provide various documents depicting proposed elevations, dimensions, and other details demonstrating that the proposed Signature Bridge conformed to FDOT's Structural Detailing Manual.

18. The RFP generally stated that the Signature Bridge "shall meet the criteria set forth in this document."

19. To ensure that offerors complied with the RFP, FDOT required a licensed structural engineer to certify that renderings included with the offer were dimensionally accurate and met certain requirements for length, height, layout, and other dimensions.

20. The RFP stated that FDOT would not permit the winning offeror to make dimensional changes to their proposed Signature Bridge design, except minor deviations within well-defined tolerances.

### *The Phase I Agreement*

21. CJV and HDR partnered to prepare a submittal to FDOT in response to the RFP, with HDR acting as the licensed design professional of record.

22. On or about April 24, 2017, CJV and HDR entered into an Agreement for Design Services for Phase I of the Project ("Phase I Agreement"). A true and correct copy of the Phase I Agreement is attached hereto and incorporated by reference as Exhibit A.

23. The Phase I Agreement required HDR, through licensed and qualified design professionals, to prepare Preliminary Design Documents, including "all work product necessary to comply with the design requirements of the RFP." Ex. A at p. 3, Phase I Agreement ¶ III(A).

24. The Phase I Agreement stated: "[HDR] acknowledges that the time which is set forth in this schedule for the provision of [HDR's] Phase I Services shall permit delivery of the services in a manner consistent with [HDR]'s Standard of Care. The parties agree and acknowledge that time is of the essence." Ex. A at p. 3, Phase I Agreement ¶ III(B).

25. The Phase I Agreement stated: "The standard of care for all professional services provided by [HDR] pursuant to this [Phase I Agreement] shall be the care and skill ordinarily exercised by members of the same profession, on projects of similar size, geography and complexity, subject to applicable requirements for licensed professionals in the state of Florida at the time the services are performed." Ex. A at p. 9, Phase I Agreement ¶ III(E).

### *The Phase II Agreement*

26. On or about April 24, 2017, CJV and HDR entered into a separate agreement for Phase II of the Project (Agreement for Project Services for Phase II of the Project) ("Phase II Agreement"). Ex. A at p. 3, Phase II Agreement ¶ III(C). A true and correct copy of the Phase II Agreement is attached hereto and incorporated by reference as Exhibit B.

27. The Phase II Agreement expressly stated that it terminated and superseded the Phase I Agreement, but: "[t]o the extent portions of the Preliminary Design Documents are used in the performance of [HDR]'s Phase II Services under this Agreement, they will be subject to the terms of this Agreement." Ex. B at p. 1.

28. The Phase II Agreement required HDR, acting through licensed and qualified design professionals, to perform all of the services set forth in Exhibit G thereto. Ex. B at p. 3, Phase II Agreement ¶ III(A).

29. The Phase II Agreement described HDR's scope of services as "preparing and providing the complete design, and the plans and specifications specified in, or required by, the RFP and all the addenda, as it pertains to the HDR scope in Attachment 1." Ex. B at p. 50, Phase II Agreement Ex. G.

30. The Phase II Agreement stated: "The standard of care for all professional services provided by [HDR] pursuant to this Agreement shall be the care and skill ordinarily exercised by members of the same profession, on projects of similar size, geography and complexity, subject to

applicable requirements for licensed professionals in the state of Florida at the time the services are performed." Ex. B at p. 11, Phase II Agreement ¶ IV(B).

31. The Phase II Agreement required HDR to, among other things, "advise [CJV] of additional studies and testing required for Project design and the impact results of such studies and testing may have on [CJV]'s price and schedule. Ex. B at p. 5, Phase II Agreement ¶ IV(A)(3).

32. The Phase II Agreement provided that "[HDR]'s services under this Design Agreement shall be completed in accordance with the Phase II Deliverable schedule in order to avoid delay to the Construction Schedule." Ex. B at p. 4, Phase II Agreement ¶ III(B).

33. The Phase II Agreement reiterated that "time is of the essence in regard to all obligations, dates and deadlines contained in this Design Agreement." Ex. B at p. 4, Phase II Agreement ¶ III(B).

34. The Phase II Agreement stated that, in addition to certain fees, HDR would be reimbursed in accordance with Exhibit B, "[a]s full and complete compensation for the satisfactory performance and provision of all services, materials, obligations and Services under this Phase II Agreement." Ex. B at p. 4, Phase II Agreement ¶ III(C).

35. The Phase II Agreement stated: "No payment made under this Design Agreement shall operate as an admission or acceptance by Contractor that the Design Agreement has been complied with or preclude any action for damages against [HDR] should it fail to fully and properly perform under the Design Agreement." Ex. B at p. 5, Phase II Agreement ¶ III(C)(2).

36. The Phase II Agreement stated: "To the extent [HDR]'s services are approved or passed on to [FDOT] by [CJV], it shall not relieve, reduce or in any manner effect [HDR]'s full responsibility to [CJV] for its services and obligations under this Design Agreement. Ex. B at p. 11, Phase II Agreement ¶ IV(A)(8).

37. The Phase II Agreement provided that "disputes related hereto shall be governed by the laws of the State of Florida." Ex. B at p. 32, Phase I Agreement ¶ XIII(E).

38. The Phase II Agreement provided for the prevailing party to recover its costs and expenses, including without limitation, court costs, attorneys' fees, and expert witness fees in any litigation "over the provisions of this Design Agreement, the Services, payment therefor[] or otherwise." Ex. B at pp. 19-20, Phase II Agreement ¶ VIII(I).

### *The Design-Build Contract*

39. CJV timely submitted to FDOT a written proposal in response to the RFP, which included the Preliminary Design Documents prepared by Defendants.

40. LoBuono was an employee of HDR and served as the structural engineer of record for the Signature Bridge Design.

41. Included with CJV's proposal were two certifications, executed by LoBuono, attesting that the Preliminary Design Documents for the Signature Bridge complied with FDOT's technical requirements for road and bridge construction.

42. LoBuono specifically certified in the Preliminary Design Documents the dimensional accuracy of the cable layout, apex height, height of cable attachments, suspension span length, pier/arch/pylon locations and other dimensions of the Signature Bridge.

43. LoBuono further certified: "that sufficient preliminary engineering has been performed to ensure the viability of the Signature Bridge being proposed."

44. On or about July 12, 2017, FDOT awarded CJV a contract for all engineering, design, procurement, and construction necessary to complete the Project ("Design-Build Contract"), partly on the basis of the Preliminary Design Documents prepared by HDR and certified by LoBuono for the Signature Bridge.

45. The Design-Build Contract provided that time was of the essence and required CJV to complete the entire Project by July 11, 2021—1,460 calendar days from the effective date.

46. The Design-Build Contract required CJV to submit a construction schedule which, once accepted by FDOT, was binding on CJV and was only subject to an extension of time for delays that were outside the fault or negligence of CJV and its subcontractors, including HDR.

### *Failure to Calculate Wind Loads*

47. Defendants were responsible for researching, calculating, and properly accounting for anticipated wind loads that would be encountered by the Signature Bridge, and factoring those wind loads into the Preliminary Design Documents.

48. Calculation of dynamic wind loads, drag factors, drag coefficient, and other factors that can affect structural performance was particularly important when designing a long span, single rib arch bridge in Miami, an area prone to high winds, hurricanes, and severe weather.

49. When preparing the Preliminary Design Documents, Defendants: (1) failed to research expected wind loads in the area of the Signature Bridge; (2) failed to perform a proper dynamic wind analysis; and (3) failed to use correct drag coefficients for the single rib concrete arch structures that support the concrete superstructure using inclined hangers.

50. Approximately four months into the Phase II design, after it had already certified the accuracy of the Signature Bridge design, HDR first engaged a wind consultant, RWDI, to review, analyze, and test whether HDR's design could withstand the applicable wind loads.

51. RWDI performed wind tunnel tests and a buffeting analysis confirming that HDR had utilized the wrong drag coefficient. After reviewing the information provided by RWDI, HDR determined that it had underestimated the drag coefficient and failed to properly account for dynamic wind loads in the Preliminary Design Documents.

52.     HDR acknowledged that Defendants underestimated both the drag coefficient and the dynamic wind loads to which the arches of the Signature Bridge would be subjected.

53.     On or about December 5, 2018, HDR first notified the CJV that HDR was exploring options to reduce wind loading on the rib arches.

54.     On or about December 6, 2018, HDR then notified the CJV that Phase I wind load calculations failed to account for dynamic effects of wind on the Signature Bridge.

55.     On or about December 17, 2018, HDR admitted that its Phase I calculation of wind loads was lower than actual wind loads for the Signature Bridge.

56.     Analysis by an independent wind consultant hired by CJV subsequently confirmed that the Preliminary Design Documents prepared by HDR and certified by LoBuono did not properly account for the wind loads in the design for the Signature Bridge.

### *Other Design Errors and Omissions*

57.     In addition to negligently calculating wind loads for the Signature Bridge, HDR outright failed to include certain critical elements in its design for the Signature Bridge.

58.     HDR failed to specify or detail a lightning protection system, which was required by the RFP and would typically be done by a design professional on projects of the same type and complexity.

59.     HDR also failed to specify or detail structural health and monitoring systems for the Signature Bridge, which would typically be done by a design professional on projects of the same type and complexity.

60.     In addition, HDR failed to specify any lighting system as required by the Federal Aviation Administration (FAA) to alert nearby aircraft, which would typically be done by a design professional on projects of the same type and complexity.

61. HDR also indicated to the CJV that a vibration damping system would not be necessary for the inclined hanger cables. During the Phase II design , it was determined that a damping system was necessary at significant cost to the CJV.

### Other Negligent Acts

62. HDR failed to adequately staff this Project with qualified engineers and other design professionals who were capable of designing a structure like the Signature Bridge.

63. Upon information and belief, HDR instead negligently and haphazardly staffed the Project with designers and engineers in training who did not have the requisite expertise or experience to design the Signature Bridge.

64. HDR held itself out as an expert in the design of bridges like the Signature Bridge. Upon information and belief, however, HDR did not have experience or expertise designing a structure like the Signature Bridge.

### Major Changes to Signature Bridge Design

65. Starting in early 2019, CJV was forced to implement costly and time-consuming changes to the design for the Signature Bridge, due to Defendants' failure to properly perform their engineering obligations to the requisite standard of care.

66. The design changes necessitated by Defendants' negligence required substantial deviations from the tolerances certified by LoBuono and, therefore, required FDOT review and approval.

67. FDOT expressed numerous concerns about HDR's proposed revisions to the design and rejected HDR's first set of proposed revisions.

68. HDR's first proposal to revise the design relied upon modifications to the light valences at the arch rib corners with large curved metal valences to lower wind loads; however, FDOT was not convinced that these changes would be effective.

69. Several months were expended responding to FDOT's concern with the revised valences and this proposed revision was rejected by FDOT.

70. HDR's second proposal was to widen the arch ribs and add corner chamfers to the arch rib section to lower the wind loads. CJV spent several months negotiating the revised design with FDOT, which was not formally approved by FDOT until May 2019.

71. The necessary changes to the Signature Bridge arch rib design drastically increased the complexity of construction, increased steel and concrete quantities, required additional shoring, anchoring, scaffolding, and temporary support measures, complicated the installation of post-tension steel tendons, and compelled additional coordination and supervision in order to complete the Project.

72. The changes to the Signature Bridge design caused delays to the overall completion of the Project by, *inter alia*, increasing the time needed to cast and install structural forms specified in the new design, increasing the time necessary to complete detailed shop drawings and obtain FDOT approval for installation of discrete parts of the Signature Bridge, and forcing the CJV to alter its planned sequence of operations for erecting the bridge.

73. The overall completion of the Project will be delayed until at least 2025 as a result of Defendants' negligence in the design and certification of the Preliminary Design Documents.

74. CJV has incurred, and will continue to incur, hundreds of millions of dollars in increased design costs, construction costs, supervision costs, quality control and inspection costs, expert investigation costs, and attorneys' fees due to the acts and omissions of Defendants.

75. CJV has fulfilled all conditions precedent to bringing this action.

## COUNT I
### (Breach of Contract Against HDR)

76. CJV restates and incorporates by reference Paragraphs 1 through 73 as though fully set forth herein.

77. The Phase II Agreement is a valid and binding contract between CJV and HDR.

78. The Phase II Agreement required HDR to perform professional engineering and design services, including engineering and design for the Signature Bridge, with the care and skill ordinarily exercised by members of the same profession, on projects of similar size, geography and complexity, subject to applicable requirements for licensed professionals in the state of Florida at the time the services were performed.

79. CJV performed all of its material obligations to HDR under the Phase II Agreement.

80. HDR committed a material breach of its obligations under the Phase II Agreement by: (i) failing to adequately research and understand anticipated wind loads relating to the Signature Bridge; (ii) failing to engage a qualified wind consultant when preparing the Preliminary Design Documents; (iii) failing to perform a proper dynamic wind analysis for the Signature Bridge; and (iv) failing to use correct drag coefficients for the pre-bid design of the rib arches.

81. As the proximate result of HDR's breach of the Phase II Agreement, CJV has suffered, and will continue to suffer, damages of approximately $155 million, the exact amount to be proven at trial.

WHEREFORE, Plaintiff Archer Western - de Moya Joint Venture respectfully asks this Honorable Court to rule in its favor and against Defendant HDR Engineering, Inc. with respect to Count I of this Complaint and enter an order granting the following relief:

(i)   Ordering HDR to pay compensatory damages of no less than $155 million to CJV for damages incurred to date;

(ii)   Ordering HDR to pay CJV additional compensatory damages for costs, expenses, fees, and third-party liabilities (including, without limitation, claims or damages asserted by FDOT or MDX) that arise after the date of this Complaint;

(iii)   Awarding court costs, expert witness fees, and attorneys' fees incurred by CJV in relation to the dispute between CJV and HDR;

(iv)   Awarding statutory pre-judgment and post-judgment interest to CJV; and

(v)   Granting all other relief in CJV's favor that the Court deems just and appropriate.

## COUNT II
### (Negligence Against HDR)

82.   CJV restates and incorporates by reference Paragraphs 1 through 73 as though fully set forth herein.

83.   HDR owed CJV a duty of care to engineer and design the Signature Bridge with the care and skill ordinarily exercised by members of the same profession, on projects of similar size, geography and complexity, subject to applicable requirements for licensed professionals in the state of Florida at the time the services were performed.

84.   HDR breached its duty of care to CJV by: (i) failing to adequately research and understand anticipated wind loads relating to the Signature Bridge; (ii) failing to engage a qualified wind consultant when preparing the Preliminary Design Documents; (iii) failing to perform a proper dynamic wind analysis for the Signature Bridge; and (iv) failing to use correct drag coefficients for the pre-bid design of the rib arches.

85.   As the proximate result of HDR's negligence, CJV has suffered, and will continue to suffer, damages of approximately $155 million, the exact amount to be proven at trial.

WHEREFORE, Plaintiff Archer Western - de Moya Joint Venture respectfully asks this Honorable Court to rule in its favor and against Defendant HDR Engineering, Inc. with respect to Count II of this Complaint and enter an order granting the following relief:

(i) Ordering HDR to pay compensatory damages of no less than $155 million to CJV for damages incurred to date;

(ii) Ordering HDR to pay CJV additional compensatory damages for costs, expenses, fees, and third-party liabilities (including, without limitation, claims or damages asserted by FDOT or MDX) that arise after the date of this Complaint;

(iii) Awarding statutory pre-judgment and post-judgment interest to CJV; and

(iv) Granting all other relief in CJV's favor that the Court deems just and appropriate.

## COUNT III
**(Gross Negligence Against HDR)**

86. CJV restates and incorporates by reference Paragraphs 1 through 73 as through fully set forth herein.

87. HDR owed CJV a duty of care to engineer and design the Signature Bridge with the care and skill ordinarily exercised by members of the same profession, on projects of similar size, geography and complexity, subject to applicable requirements for licensed professionals in the state of Florida at the time the services were performed.

88. HDR breached its duty of care to CJV by: (i) failing to adequately research and consider anticipated wind loads relating to the Signature Bridge; (ii) failing to engage a qualified wind consultant when preparing the Preliminary Design Documents; (iii) failing to perform a proper dynamic wind analysis for the Signature Bridge; and (iv) failing to use correct drag coefficients for the pre-bid design of the rib arches.

89. The acts and omissions of HDR include failing to perform wind load calculations in a densely populated urban area subject to frequent windstorms and hurricanes.

90. A reasonable and prudent engineer would know that failure to properly calculate wind loads on a segmental arch bridge would likely result in personal injury or death, unless measures were taken to correct errors and omissions in the final design before construction of the Signature Bridge.

91. HDR had actual and constructive knowledge that its failure to perform the necessary wind load calculations and incorporate those calculations into its design for the Signature Bridge would create a clear and present danger of personal injury or death, unless measures were taken to correct errors and omissions in the final design before construction of the Signature Bridge.

92. HDR designed the Signature Bridge without first performing the necessary wind load calculations, in conscious disregard or indifference to the life, safety, and rights of persons traveling on or around the Signature Bridge.

93. As the proximate result of HDR's gross negligence, CJV has suffered, and will continue to suffer, damages of approximately $155 million, the exact amount to be proven at trial.

WHEREFORE, Plaintiff Archer Western - de Moya Joint Venture respectfully asks this Honorable Court to rule in its favor and against Defendant HDR Engineering, Inc. with respect to Count III of this Complaint and enter an order granting the following relief:

(i) Ordering HDR to pay compensatory damages of no less than $155 million to CJV for damages incurred to date;

(ii) Ordering HDR to pay CJV additional compensatory damages for costs, expenses, fees, and third-party liabilities (including, without limitation, claims or damages asserted by FDOT or MDX) that arise after the date of this Complaint;

(iii) Ordering HDR to pay CJV punitive damages of no less than $15 million;

(iv) Awarding court costs, expert witness fees, and attorneys' fees incurred by CJV in relation to the dispute between CJV and HDR;

(v) Awarding statutory pre-judgment and post-judgment interest to CJV; and

(vi) Granting all other relief in CJV's favor that the Court deems just and appropriate.

## COUNT IV
### (Negligence Against LoBuono)

94. CJV restates and incorporates by reference Paragraphs 1 through 73 as though fully set forth herein.

95. LoBuono was, at all times relevant hereto, an engineer licensed in the State of Florida.

96. LoBuono owed CJV a duty of care to engineer and design the Signature Bridge in a professional and competent manner, with the care and skill ordinarily exercised by engineers licensed in the State of Florida.

97. It was reasonably foreseeable that CJV would be damaged or injured if LoBuono negligently performed the engineering calculations for the Signature Bridge including, among other things, proper wind-load calculations.

98. LoBuono breached his standard of care to CJV by: (i) failing to adequately research and understand anticipated wind loads relating to the Signature Bridge; (ii) failing to perform a proper dynamic wind analysis for the Signature Bridge; (iii) failing to use correct drag coefficients for the pre-bid design of the rib arches; and (iv) certifying to CJV that the design for the Signature

Bridge in the Preliminary Design Documents was dimensionally accurate and that sufficient preliminary engineering was performed to ensure the viability of the Signature Bridge depicted in the Preliminary Design Documents.

99. As the proximate result of LoBuono's negligence, CJV has suffered, and will continue to suffer, damages of approximately $155 million.

WHEREFORE, Plaintiff Archer Western - de Moya Joint Venture respectfully asks this Honorable Court to rule in its favor and against Defendant Joseph LoBuono with respect to Count IV of this Complaint and enter an order granting the following relief:

(i) Ordering LoBuono to pay compensatory damages of no less than $155 million to CJV for damages incurred to date;

(ii) Ordering LoBuono to pay CJV additional compensatory damages for costs, expenses, fees, and third-party liabilities (including, without limitation, claims or damages asserted by FDOT or MDX) that arise after the date of this Complaint;

(iii) Awarding statutory pre-judgment and post-judgment interest to CJV; and

(iv) Granting all other relief in CJV's favor that the Court deems just and appropriate.

## COUNT V
### (Gross Negligence Against LoBuono)

100. CJV restates and incorporates by reference Paragraphs 1 through 73 as through fully set forth herein.

101. LoBuono was, at all times relevant hereto, an engineer licensed in the State of Florida.

102. LoBuono owed CJV a duty of care to engineer and design the Signature Bridge in a professional and competent manner, with the care and skill ordinarily exercised by engineers licensed in the State of Florida.

103. It was reasonably foreseeable that CJV would be damaged or injured if LoBuono negligently performed the engineering calculations for the Signature Bridge including, among other things, if LoBuono failed to properly perform wind-load calculations and account for the effects of wind on the Signature Bridge.

104. LoBuono breached his standard of care to CJV by: (i) failing to adequately research and understand anticipated wind loads relating to the Signature Bridge; (ii) failing to perform a proper dynamic wind analysis for the Signature Bridge; (iii) failing to use correct drag coefficients for the pre-bid design of the rib arches; and (iv) certifying to CJV that the design for the Signature Bridge in the Preliminary Design Documents was dimensionally accurate and that sufficient preliminary engineering was performed to ensure the viability of the Signature Bridge depicted in the Preliminary Design Documents.

105. The acts and omissions of LoBuono include failing to perform wind load calculations in a densely populated urban area subject to frequent windstorms and hurricanes.

106. A reasonable and prudent engineer would know that failure to properly calculate wind loads on a segmental arch bridge would likely result in personal injury or death, unless measures were taken to correct errors and omissions in the final design before construction of the Signature Bridge.

107. LoBuono had actual and constructive knowledge that his failure to perform the necessary wind load calculations and incorporate those calculations into its design for the Signature Bridge would create a clear and present danger of personal injury or death, unless measures were taken to correct errors and omissions in the final design before construction of the Signature Bridge.

81364661v.1

108. LoBuono designed the Signature Bridge without first performing the necessary wind load calculations, in conscious disregard or indifference to the life, safety, and rights of persons traveling on or around the Signature Bridge.

109. As the proximate result of LoBuono's gross negligence, CJV has suffered, and will continue to suffer, damages of approximately $155 million, the exact amount to be proven at trial.

WHEREFORE, Plaintiff Archer Western - de Moya Joint Venture respectfully asks this Honorable Court to rule in its favor and against Defendant Joseph LoBuono with respect to Count V of this Complaint and enter an order granting the following relief:

(i) Ordering LoBuono to pay compensatory damages of no less than $155 million to CJV for damages incurred to date;

(ii) Ordering LoBuono to pay CJV additional compensatory damages for costs, expenses, fees, and third-party liabilities (including, without limitation, claims or damages asserted by FDOT or MDX) that arise after the date of this Complaint;

(iii) Ordering LoBuono to pay CJV punitive damages of no less than $15 million;

(iv) Awarding court costs, expert witness fees, and attorneys' fees incurred by CJV in relation to the dispute between CJV and LoBuono;

(v) Awarding statutory pre-judgment and post-judgment interest to CJV; and

(vi) Granting all other relief in CJV's favor that the Court deems just and appropriate.

Dated: April 1, 2022                    Respectfully submitted,

/s/ Alex S. Drummond
Alex S. Drummond (Fla. Bar No. 0038307)
adrummond@seyfarth.com
SEYFARTH SHAW LLP
1075 Peachtree Street, NE, Suite 2500
Atlanta, Georgia 30309-3962
Tel.: (404)-885-1500

Jason Smith (*pro hac vice* application forthcoming)
Elizabeth Harraka (*pro hac vice* application forthcoming)
jnsmith@seyfarth.com
eharraka@seyfarth.com
SEYFARTH SHAW LLP
975 F Street, NW
Washington, D.C. 20004
Tel.:   (202)-463-2400
Fax.:   (202)-828-5393

Anthony LaPlaca (*pro hac vice* application forthcoming)
alaplaca@seyfarth.com
SEYFARTH SHAW LLP
2 Seaport Lane, Suite 1200
Boston, MA 02210
Tel.: (617)-946-4800
Fax: (617)-946-4801

*Attorneys for Plaintiff Archer Western - de Moya Joint Venture*

81364661v.1