**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 22-20991-CV-WILLIAMS**

ARCHER WESTERN – DE MOYA JOINT
VENTURE,

       Plaintiff,

v.

HDR ENGINEERING, INC., *et al.*,

       Defendants.

_____/

**<u>OMNIBUS ORDER</u>**

    **THIS MATTER** is before the Court on the Motion for Partial Summary Judgment (DE 143) filed by Defendant HDR Engineering, Inc. ("***HDR***") and the Motion for Summary Judgment[1] (DE 163) filed by Defendant Joseph LoBuono ("***LoBuono***").  Plaintiff Archer Western – De Moya Joint Venture ("***CJV***") filed its Responses[2] (DE 147; DE 169) to which Defendants HDR and LoBuono filed their respective Replies (DE 152; DE 188). Having carefully reviewed the Parties' briefing and for the reasons set forth below, HDR's Motion for Partial Summary Judgment (DE 143) is **GRANTED** and LoBuono's Motion for Summary Judgment (DE 163) is **GRANTED IN PART AND DENIED IN PART**.

---

[1] Although LoBuono requested a hearing on his Motion for Summary Judgment pursuant to Southern District of Florida Local Rule 7.1(b)(2), his request for a hearing is denied.

[2] Similarly, CJV requested a hearing on HDR's Motion for Summary Judgment pursuant to Southern District of Florida Local Rule 7.1(b)(2).  CJV's request for a hearing is also denied.

I.   **BACKGROUND**[3]

   A. *Factual Background*

On February 6, 2017, the Florida Department of Transportation ("***FDOT***") issued its final Request for Proposals ("***RFP***") soliciting competitive proposals for the design-build services on a project to enhance three major roadways in Miami, Florida: State Road 836 ("***SR 836***"), Interstate 95 ("***I-95***"), and Interstate 395 ("***I-395***"). (DE 79 at 3; DE 144 at 1.)  In addition to the improvements to the roadways, the Project involves the design and construction of a precast segmental arch bridge known as the Signature Bridge, stretching more than 1,000 feet above and across Biscayne Boulevard located in downtown Miami.  (DE 144 at 1.)   Along with a Technical Proposal, all bidders for the Project were required to submit a Project Specific Price Proposal ("***Price Proposal***") and identify a "Design Structures Engineer of Record" for the Signature Bridge.  (DE 164 at 1.)  In response to the RFP, Plaintiff CJV, a joint venture comprised of Archer Western Contractors, LLC ("***AWC***") and The de Moya Group, Inc. ("***de Moya***"),[4] submitted its Technical Proposal for the I-395/SR 836/I-95 design-build project ("***Project***") on February 28, 2017.  (DE 144 at 1.)  In CJV's Technical Proposal, LoBuono certified that he was the Design Structures Engineer of Record, attesting that "sufficient preliminary engineering

---

[3] In accordance with Southern District of Florida Local Rule 56.1, the Parties properly filed separate and contemporaneous Statements of Material Facts.  *See* S.D. Fla. L.R. 56.1(a). The Court will cite to the Parties' Statements of Material Facts throughout this Order.

[4] The Court finds that it has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as all Parties including CJV, a limited liability company, are diverse and the amount-in-controversy requirement has been satisfied.  Accordingly, because this case is a diversity action, the Court shall apply the substantive law of the forum state, Florida.  *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997); *Admiral Ins. Co. v. Feit Mmgt. Co.*, 321 F.3d 1326, 1328 (11th Cir. 2003).

has been performed to ensure the viability of the Signature Bridge being proposed." (DE 164 at 1; DE 170 at 9.)  Two (2) months later, on April 24, 2017, CJV submitted its Price Proposal to FDOT, designating a total contract amount of $802,139,000 and a total estimated time of completion of four years.  (DE 144 at 1.)

According to its Technical Proposal, CJV separated the development of the Project into two distinct stages.  Phase I pertained to the preliminary design and proposal services for the Signature Bridge and Phase II related to the final design plans and construction of the Signature Bridge.  (DE 144 at 3–4.)  To assist with the completion of the Project, CJV executed an Agreement for Design Services (Phase I) ("***Phase I Agreement***") and an Agreement for Project Services (Phase II) ("***Phase II Agreement***") with HDR on April 24, 2017. (*Id.*)  In Phase I, HDR prepared and submitted preliminary design documents for the Project to CJV, which CJV relied upon in preparing its submittals to FDOT. (DE 144 at 3; DE 144-1 at 1; DE 151 at 2.)  By July 12, 2017, FDOT provisionally selected CJV as the awardee of the Project.  (DE 144-1 at 23.)  However, due to a bid protest from another bidder, FDOT did not officially award the Project to CJV until July 12, 2018, when FDOT and CJV memorialized their agreement in a design-build contract[5] ("***Design-Build Contract***").  (DE 144 at 2.)

Subsequent to executing the Design-Build Contract, CJV issued HDR a notice to proceed with Phase II final design services.  (*Id.* at 4.)  In relevant part, the Phase II Agreement terminated and superseded the Phase I Agreement once CJV issued the

---

[5] A "design-build contract" is defined as a single contract with a design-build firm for the design and construction of a public construction project. *See* Fla. Stat. § 287.055(2)(i).

notice to proceed with Phase II services.[6]  (DE 164 at 4.)  Under the Phase II Agreement, HDR operates as the "Architect/Engineer" or "Engineer" and CJV performs as the "Contractor" for the Project.  (DE 144 at 4.)  In general, HDR's Phase II services include advancing the preliminary design documents, through interim design submittals, into final design documents used for the Project's final construction.[7]  (DE 164 at 4.)  Additionally, within the scope of its services, HDR is responsible for providing properly licensed and qualified personnel and design professionals, as well as all necessary equipment and material to complete Phase II services.  (DE 144-11 at 3.[8])

The Phase II Agreement includes several provisions related to the defined standard of care and limitation of liability.  With regard to the standard of care, the Phase II Agreement provides that,

> [t]he standard of care for all professional services provided by the Architect/Engineer pursuant to this Design Agreement shall be the care and skill ordinarily exercised by members of the same profession, on projects of similar size, geography, and complexity, subject to applicable requirements for licensed professionals in the state of Florida at the time the services are performed.

---

[6] Notably, the Phase II Agreement details that "[t]his Design Agreement Phase II will not be considered valid and enforceable until the Contractor issues a Notice to Proceed." (DE 144-11 at 1.)

[7] As set forth within the Phase II Agreement, "Preliminary Design Documents [] used in the performance of Architect/Engineer's Phase II Services under this Agreement, [are] subject to terms of this Agreement."  (DE 144-11 at 1; DE 170 at 5.)  Moreover, under the Phase II Agreement, "Construction Documents" are "those Final Design documents, consisting of drawings and specifications, to be prepared or assembled by [HDR] consistent with the Preliminary Design Documents, Accepted Proposal, and approved to be released to [CJV] for construction of the Project."  (DE 144-11 at 2.)

[8] All citations to the Parties' Phase II Agreement (DE 144-11) reference the page number located the bottom right corner of the document.

(*Id.* at 11.)  As it relates to the Design Quantity,

> [CJV] agrees that [HDR] shall have no liability for [CJV's] Claims related to growth in construction material quantities for the Project over those projected in [CJV's] Proposal, other than damages arising from [the] Designer's failure to comply with the RFP requirements, stated design criteria or other standard industry reference, which shall be capped at the aggregate limit of liability stated in Section XII.J.

(*Id.* at 30–31.)  Section XII.J, or the Aggregate Limit of Liability, provides that, subject to an enumerated carve-out condition,

> the total aggregate liability of [HDR] . . . and their respective directors, officers and employees to [CJV] . . . for  any and all claims, losses, costs, or damages whatsoever arising out of, resulting from or in any way related to the Project or this Agreement from any cause or causes, including but not limited to the negligence, professional errors or omissions, . . . breach of contract or warranty, express or implied, shall not exceed the proceeds actually recovered from the project specific professional liability policy defined in article X.D.1.

(*Id.* at 32.)  And pursuant to X.D.1, HDR purchased a project-specific professional liability policy ("**PSPL Policy**") with a $10,000,000 policy limit, which represents the Aggregate Limit of Liability of the Phase II Agreement.  (DE 144 at 5; DE 144-11 at 25.)  However, in accordance with the relevant carve-out provision, the Aggregate Limit of Liability "shall not apply to any loss or damage arising from [HDR's] gross negligence, willful misconduct, criminal acts, fraud, intentional acts or third party actions."  (DE 144-11 at 31.)

At the onset of CJV's engagement with HDR, LoBuono, a licensed Florida professional engineer, worked as a HDR employee and served as the lead engineer, also known as the "Design Structure Engineer of Record," for the Signature Bridge.  (DE 79 at 8; DE 164 at 9; DE 170 at 9.)  As the Design Structure Engineer of Record, LoBuono supervised all HDR engineers and, among other responsibilities, oversaw HDR's

calculation of loading inputs completed by engineer Gary Wang ("**Wang**"). (DE 148-1 at 173–74; DE 148-3 at 67, 69.)  With LoBuono's supervision, HDR developed its analysis related to the design and construction of the Project for CJV.  (DE 144 at 3; DE 151 at 2, 9.)  CJV included HDR's analysis and data in its Technical Proposal and submittals to FDOT. (DE 144 at 3; DE 151 at 2, 9.)

In support of its claims against Defendants, CJV cites to documentary and testimonial evidence that HDR did not engage or retain a wind expert to assist in calculating the wind loads—otherwise known as the wind pressure or wind force—on the structure of the Signature Bridge at the time HDR prepared its initial design plans in 2017. (DE 151 at 11–12.)  It was not until August 3, 2018, approximately one (1) month into Phase II of the Project, that HDR initially engaged a wind expert for the purposes of refining its engineering analysis.[9]  (DE 151 at 12; DE 153 at 7.)   At that time, HDR executed a written subconsultant agreement with RWDI USA, LLC ("**RWDI**"), a consulting engineering company.  (DE 151 at 12; DE 153 at 7.)   RWDI immediately proposed organizing a meeting with HDR and LoBuono to discuss "an initial set of wind loads, something better than AASHTO," but LoBuono ultimately declined this invitation.[10]  (DE 151 at 12.)

---

[9] HDR did not have wind engineers on staff when CJV contracted for its services. (DE 148-1 at A0546, 139:8.)

[10] AASHTO is the national standard in the U.S. used for estimating wind load in the process of designing and constructing bridges. (DE 148-1 at A0295, 67:8–67:10.)  But, a RWDI wind engineer engaged by Plaintiff testified that AASHTO was not the governing standard for the Project based on the standard design guideline provided by FDOT, and that AASHTO did not account for advanced complexities, failing to deliver a "refined" set of wind loads appropriate for a project of this nature.  (DE 148-1 at A0295, 67:11–67:19, 67:23–68:6.)

By November 15, 2018, RWDI provided HDR with its first set of "wind loads" for the Signature Bridge for the purpose of completing the mandatory 60% drawing submittal to FDOT.  (DE 151 at 12.)   In response, LoBuono stated that RWDI's data was too high to the point where "they would not have been viable" without "significant changes" to the overall Project.  (DE 148-1 at A0221, 182:01–182:07.)   Accordingly, RDWI sent HDR a second set of wind loads and code calculations based on a comprehensive evaluation of wind profiles and adjacent terrain at the Project site, estimating wind forces more than three times higher than the loads calculated by Wang in HDR's preliminary calculations.  (DE 148-7 at A2300; DE 151 at 12.)   In conferring with other engineer consultants, LoBuono acknowledged HDR's preliminary wind loads "seem[] low by any standards" and expressed uncertainty as to why these preliminary wind loads were calculated in such a manner.  (DE 148-7 at A2317; DE 151 at 12.)  However, despite some trepidation over submitting these preliminary loads, LoBuono instructed his team to use these calculations in HDR's 60% submittal in December 2018.[11]   (DE 148-7 at A2321; DE 151 at 12.)  According to CJV, at that time HDR and LoBuono did not disclose any errors or omissions committed under LoBuono's supervision in noncompliance with the Phase II Agreement.  (DE 148-1 at A0547; DE 151 at 12.)  Instead, HDR pursued a contingency plan to adapt other elements of the Project— including the incorporation of a larger width of the Signature Bridge's arch—which would allow HDR to utilize the smaller drag coefficient calculated in the preliminary wind loads.  (*Id.*)  Ultimately, this plan, known as Design Enhancement 9, proved to be untenable.  Therefore, HDR subsequently re-designed the

---

[11] One HDR employee opined that LoBuono was "putting [HDR] way out on a limb" regarding the December 2018 submittal.  (DE 148-7 at A2321.)

Signature Bridge to address the higher wind loads which CJV argues resulted in delays and attendant damages in completing the Project.  (DE 151 at 13.)

### B.  Procedural Background

On April 1, 2022, CJV filed its original Complaint alleging five claims including a single breach of contract claim against HDR as well as two separate claims of negligence and gross negligence against HDR and LoBuono, respectively.  (DE 1.)  After review of Defendants' Motions to Dismiss (DE 16; DE 17), the Court dismissed CJV's negligence and gross negligence claims asserted against HDR and LoBuono.  (DE 62.)  Following the Court's ruling, CJV filed a Motion for Reconsideration or, in the Alternative, Leave to Appeal (DE 63) which the Court set for a hearing on June 9, 2023.  At the hearing, the Court granted, in part, and denied, in part, the Motion for Reconsideration, providing leave for CJV to amend its negligence claim against LoBuono only.  (DE 70.)   CJV filed its First Amended Complaint (DE 79) on July 25, 2023.   Then, on August 8, 2023, HDR and LoBuono filed separate Motions to Strike CJV's First Amended Complaint (DE 82; DE 83), which the Court denied. (DE 93.)  The Parties subsequently completed extensive fact and expert discovery.  Now HDR and LoBuono seek partial and full summary judgment pursuant to Federal Rule of Civil Procedure 56.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[O]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).  The party seeking summary judgment carries the burden of "informing the district court of the basis for this motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  "To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case." *Feinman v. Target Corp.*, 2012 WL 6061745, at *3 (S.D. Fla. Dec. 6, 2012) (citing *Celotex*, 477 U.S. at 325).  Once the movant satisfies their burden, the burden of production shifts to the non-moving party, which must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party and must resolve all reasonable doubts about the facts in favor of the non-movant."  *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotations, citations omitted).  However, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577

(11th Cir. 1990).  Evidence that is "merely colorable" or "not significantly probative" is insufficient to defeat a motion for summary judgment.  *Anderson*, 477 U.S. at 249–50.  At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.

## III.  DISCUSSION

### A. Negligence

In order to recover for negligence under Florida law, a plaintiff must show (1) that the defendant owed the plaintiff a duty of reasonable care; (2) that the defendant breached that duty; (3) that the breach was the proximate cause of plaintiff's injury; and (4) that plaintiff suffered damages.  *Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003).  In this case, LoBuono argues that summary judgment is appropriate as to CJV's negligence claim because LoBuono did not owe CJV a legal duty, but even if he did, LoBuono asserts that CJV's negligence claim is barred by the applicable statute of limitations and the independent tort doctrine.[12]  (DE 163 at 8–14.)

The principle of "duty" is linked to the concept of foreseeability and may arise from four general sources: (1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case. *Clay*, 873 So. 2d at 1182.   In support of its claim, CJV maintains that LoBuono, as a professional licensed engineer, owed a

---

[12]  Additionally, LoBuono contends that CJV presents no evidence that LoBuono's purported acts caused CJV's damages and any damages CJV seeks in relief are subject to the contractual limitation of liability included in the Phase II Agreement.  (*Id.* at 14–16, 19–20.)

common law and statutory duty of care for services rendered in the Phase II Agreement. The Court agrees.  For professionals, the Florida Supreme Court has established that "the law imposes a duty to perform the requested services in accordance with the standard of care used by similar professionals in the community under similar circumstances." *Moransais v. Heathman*, 744 So. 2d 973, 975–76 (Fla. 1999). Moreover, Florida statutory law acknowledges that individual professional engineers owe a duty of care or are responsible for their negligent acts. *Id.* (interpreting liability provisions pertaining to engineers under Chapter 471 of the Florida Statutes).  In particular, Chapter 471 of the Florida Statutes defines the practice of "engineering" to be "any service or creative work, the adequate performance of which requires engineering education, training, and experience in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as consultation, investigation, evaluation, planning, and design of engineering works and systems."  Fla. Stat. § 471.005(7).

Here, LoBuono does not dispute that he served as the lead engineer during a period of Phase II. (DE 163 at 11.)  However, he contends that CJV failed to demonstrate that LoBuono owed a specific legal duty directly to CJV.  (*Id.*)  The evidence presented in this case does not support such a conclusion.  LoBuono rendered "engineering" services directly to CJV during Phase II of the Project from August through December 2018, as he supervised other engineers and wind engineer consultants to provide data sets on the wind loads, drag coefficient, and gust factors included in the 60% submittals.  Email correspondence and deposition testimony reveals LoBuono actively gave instructions to subordinate engineers about the evaluation of the wind loads and drag coefficients

identified by RWDI.  Moreover, although LoBuono disputes its significance, the 60%

submittal included his digital licensed seal which arguably demonstrates his responsibility

and oversight for the information provided.[13]  Because LoBuono provided this service

directly to CJV while he operated as the Engineer of Record for the Project until June

2019, the Court finds that he did owe a duty to perform in accordance with the standard

of care used by similar professionals in the community under similar circumstances.[14]

*See e.g.*, *A.R. Moyer, Inc. v. Graham*, 285 So. 2d 397, 402 (Fla. 1973) (recognizing

professional liability for a supervising architect to a third-party contractor);  *Grace &*

*Naeem Uddin, Inc. v. Singer Architects, Inc.*, 278 So. 3d 89, 92 (Fla. Dist. Ct. App. 2019)

(acknowledging that Florida courts require the existence of "supervisory duties" or

---

[13] In his Motion, LoBuono argues that he does not owe CJV a duty because he did not
sign the 60% submittal. (DE 163 at 11.)  However, the Court does not find his argument
persuasive as the record reveals that he supervised efforts to provide information
included in the 60% submittal and his official licensed seal or "stamp" is included on the
60% submittal paperwork. (DE 148-7 at A2317–A2323; DE 164-5 at 490:12–493:12; DE
164-24 at 4; DE 164-23 at 5.)

[14] Ultimately, the factual determination as to the causal chain that led to any damages
incurred due to the delay of the Project is one that must be determined by a jury.  CJV
has proffered sufficient evidence that demonstrates a genuine dispute of fact regarding
whether LoBuono's supervision of the Project and the wind calculations caused CJV's
damages.  In light of the opposing expert reports and opinions regarding standard of care
and management of construction projects, summary judgment would be improper on the
issue of causation as it would require the Court to weigh competing evidence and make
credibility determinations to reach a resolution. *Anderson*, 477 U.S. at 255 ("Credibility
determinations, the weighing of the evidence, and the drawing of legitimate inferences
from the facts are jury functions, not those of a judge, whether he is ruling on a motion for
summary judgment or for a directed verdict.").

responsibilities and a "close nexus" between the architect and contractor for *Moyer* to apply).

Assuming that LoBuono owed CJV a duty, LoBuono alternatively argues that CJV's negligence claim is barred under applicable statute of limitations grounds and the independent tort doctrine.[15]   The Court previously discussed the relevant statute of limitations in prior Orders (DE 69; DE 70).   Because CJV has alleged facts and circumstances related to LoBuono's conduct within the Phase II Agreement that occurred after April 1, 2018, the Court finds that CJV's negligence claim against LoBuono is not barred by the statute of limitations.  With regard to the independent tort doctrine, LoBuono contends that CJV cannot sue an employee of the engineering firm in tort "to sidestep" contract-based limitations on recovery.  (DE 163 at 13.)

As an initial matter, the Court finds that independent tort doctrine does not preclude CJV's negligence claim because LoBuono was not a signator to CJV's and HDR's Phase II Agreement, and the Parties have not advanced any facts that he was a third-party beneficiary.   Thus, CJV has no standing to bring a breach of contract claim against LoBuono.  *See Danow v. Great Am. Ins. Co.*, 2021 WL 6693759, at *2 (S.D. Fla. Apr. 8, 2021) ("As a general rule, only parties to a contract or third-party beneficiaries have standing to sue for breach of contract.").   However, as a licensed engineer, LoBuono supervised and engaged in the design process that included providing data as to the wind loads and drag coefficients.  LoBuono then confirmed submittals ultimately delivered to

---

[15] Under Florida law, the "independent tort doctrine" requires that a party demonstrate a tort claim is "independent of any breach of contract claim." *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 947 (11th Cir. 2014) (citing *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 408 (Fla. 2013) (Pariente, J., concurring)).

CJV, including the 60% submittals in November and December 2018, with his official stamp and seal.  (DE 164-24 at 4; DE 164-23 at 5.)  Because Florida law provides that a professional may still be held liable for any negligence committed while rendering professional services as an employee of a corporation, the Court finds that CJV's negligence claim is separate from any breach of contract claim and the independent tort doctrine does not warrant granting summary judgment in LoBuono's favor. *Trikon Sunrise Assocs., LLC v. Brice Bldg. Co., Inc.*, 41 So. 3d 315, 320 (Fla. Dist. Ct. App. 2010) (finding that plaintiff's claims against an architectural firm and the individual architect could move beyond summary judgment as professionals may be personally and individually liable in addition to their employer).

### B.  Breach of Contract

There is no question that the Phase II Agreement is governed by the laws of the state of Florida and, as a result, the Court applies Florida law to Plaintiff's breach of contract claim.[16]  (DE 144 at 6; DE 151 at 3.)  HDR seeks partial summary judgment as to damages related to CJV's breach of contract claim in light of the limitation of liability provision included in the Phase II Agreement capping HDR's total aggregate liability to the $10 million maximum of the PSPL Policy.[17]  (DE 143 at 7–14.)  Notably, by extension, LoBuono contends that CJV's claims and damages against him also fall within the scope of the same limitation provision.  (DE 163 at 19–20.)  In support of their argument for

---

[16] Under Florida law, a breach of contract action requires three elements: (1) a valid contract, (2) a material breach, and (3) damages. *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. Dist. Ct. App. 1992)).

[17] CJV currently claims approximately $389 million in damages arising from the subsequent re-design of the Signature Bridge, including direct costs, delay damages, and mitigation costs.  (DE 147 at 10.)

summary judgment, Defendants assert that limitation of liability provisions are enforceable under Florida law and there is no genuine issue of material fact regarding HDR's purported breach and LoBuono's alleged conduct which constitute any of the enumerated carve-outs excluded from the limitation of liability provision.  Specifically, HDR maintains that CJV should not be allowed to reconfigure the plain meaning of the contractual language based on CJV's position that the Parties, at the time they executed the Phase II Agreement, did not intend "gross negligence" to require proof of imminent harm.  (DE 143 at 11–12.)  In response, CJV argues that there is ambiguity regarding the Parties' intended meaning of "gross negligence" and a reasonable jury weighing the evidence could find that HDR's conduct equates to one or more of the excluded conduct included in the carve-out provision.  (DE 147 at 1, 14–15.)  CJV also asserts that the limitation of liability provision neither shields LoBuono nor establishes a maximum cap on CJV's damages for its negligence claim because the Phase II Agreement lacked the specific requirements for enforcing "contractual limitations on liability" against individual licensed engineers as set forth in Florida Statutes Section 558.0035.[18]  (DE 169 at 18–19.)

Under Florida law, absent an ambiguity, interpretation of a contract is a question of law to be decided by the court. *Wheeler v. Wheeler, Erwin & Fountain, P.A.*, 964 So.

---

[18] In a section titled "Design Professionals; contractual limitation on liability," Florida law states that "[a] design professional employed by a business entity or an agent of the business entity is not individually liable for damages resulting from negligence occurring within the course or scope of a professional services contract if: . . . (c) The contract includes a prominent statement, in uppercase font that is at least 5 point sizes larger than the rest of the text, that, pursuant to this section, an individual employee or agent may not be held individually liable for negligence." Fla. Stat. § 558.0035(1)(c).

2d 745, 749 (Fla. Dist. Ct. App. 2007).  Only when an ambiguity exists requiring resolution by resort to extrinsic evidence is a question of fact presented.  *Id.*; *see also Weingart v. Allen & O'Hara, Inc.*, 654 F.2d 1096, 1103 (5th Cir. 1991) ("Where the language of a contract is unambiguous and not subject to conflicting inferences, construction of the contract is a question of law for the court, not a question of fact for the jury.").[19]  As an initial matter, limitation of liability provisions are enforceable under Florida law.[20]  *See e.g.*, *Rollins*, 454 So. 2d at 583; *Fla. Power & Light Co. v. Mid-Valley, Inc.*, 763 F.2d 1316, 1322 (11th Cir. 1985); *CC-Aventura, Inc. v. The Weitz Co., LLC*, 2009 WL 3326806, at *6 (S.D. Fla. Oct. 9, 2009).  In the Phase II Agreement, the Parties mutually agreed that subject to enumerated carve-outs,

> the total aggregate liability of [HDR] . . . and their respective directors, officers and employees to [CJV] . . . for  any and all claims, losses, costs, or damages whatsoever arising out of, resulting from or in any way related to the Project or this Agreement from any cause or causes, including but not limited to the negligence, professional errors or omissions, . . . breach of contract or warranty, express or implied, shall not exceed the proceeds

---

[19] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[20] While limitation of liability clauses are distinguishable from exculpatory clauses, both are included in contractual agreements to minimize the risk of loss and damages to contracting parties.  *Rollins, Inc. v. Heller*, 454 So. 2d 580, 584 (Fla. Dist. Ct. App. 1984) (noting that exculpatory clauses immunize a party from all liability and a limitation of liability clause places a cap on the total recoverable amount of damages awarded to a claimant).  Interestingly, Florida courts have ruled that an exculpatory clause "is enforceable so long as (1) the contracting parties have equal bargaining power and (2) the clause's provisions are clear and unambiguous."  *Pier I Cruise Experts v. Revelex Corp.*, 929 F.3d 1335, 1344 (11th Cir. 2019). Although the matter at issue does not involve an exculpatory clause, the Court notes that both prerequisites are present here.

actually recovered from the project specific professional liability policy defined in article X.D.1.

(DE 144-11 at 31.)  A review of the language of the limitation of liability provision confirms that the scope of the agreement included HDR's and its employees' "total aggregate liability" for "any and all claims, losses, costs, or damages" related to the Project or the Phase II Agreement.  Additionally, in straightforward terms, the provision also conveys that HDR and its employees' liability would be limited to "not exceed the proceeds actually recovered from the project specific professional liability policy," which has a $10,000,000.00 limit for "any cause or causes [of action]" including "negligence" and "breach of contract."

The pertinent carve-out excluding certain conduct from the limitation of liability provision sets forth that the Aggregate Limit of Liability or Section XII.J "shall not apply to any loss or damage arising from [HDR's] gross negligence, willful misconduct, criminal acts, fraud, intentional acts or third party actions."  Here, although the Phase II Agreement did not explicitly define the parameters of the specified conduct included within the carve-out provision, the Court finds that the terms are unambiguous.[21]  *Sanislo v. Give Kids the World, Inc.*, 157 So. 3d 256, 270–71 (Fla. 2015) (concluding that the absence of legal terms of art was not fatal in light of "otherwise clear and unequivocal language" in the contractual agreement).  The carve-out provision expressly lists the specified conduct excluded from the limitation of liability provision, making it clear that, when read together

---

[21] In its Response to HDR's Motion for Partial Summary Judgment, CJV contends that the Court should consider the Parties' understanding of the terms of the carve-out provision.  (DE 147 at 3–4, 16.)  However, the Court finds CJV's argument unavailing in the face of the clear contractual language included within the four corners of the document signed by both Parties.

with the Aggregate Limit of Liability provision, the Parties intended to limit the amount of HDR's liability except for gross negligence, willful misconduct, criminal acts, fraud, intentional acts or third party actions.   Consistent with customary contract interpretation, the Court must give the plain and ordinary meaning to these specified terms.   *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1241 (11th Cir. 2009); *TOA Trading LLC v. Mullen Auto., Inc.*, 2024 WL 2132885, at *6 (S.D. Fla. Apr. 24, 2024) ("Florida courts abide by the 'principle of contract interpretation which requires that the words used by the parties must be given their plain and ordinary meaning.'"); *Joar v. Univ. of Miami*, 474 So. 2d 239, 242 (Fla. Dist. Ct. App. 1985) ("The existence of a clear and unambiguous contract is the best evidence of the intent of the parties, and its meaning and legal effect are questions of law for determination by the court.").   Accordingly, based on the plain reading of the contract terms, the Court finds that, as a matter of law, the limitation of liability provision is clear and unambiguous.

Unlike other instances where the Court concluded that undefined terms were not clear and unambiguous, here, there is guidance for the relevant terms under Florida law. *See e.g.*, *Adapt Programs, LLC v. Veritable Billing Servs., LLC*, 2023 WL 3778251, at *7 (S.D. Fla.  Mar. 27, 2023) (finding summary judgment was improper as one of the relevant undefined terms within the exculpatory clause did not have a clear definition under Florida law).   As previously recognized by the Court, gross negligence is defined "as an act or omission that a reasonable, prudent person would know is likely to result in injury to another." *Eller v. Shova*, 630 So. 2d 537, 541 n.3 (Fla. 1993) (citing *Glaab v. Caudill*, 236 So. 2d 180 (Fla. Dist. Ct. App. 1970)); *Blanco v. Capform, Inc.*, 2013 WL 85197, at *3 (S.D. Fla. Jan. 7, 2013) (citations omitted).   Put another way, gross negligence consists

of a conscious and voluntary act or omission which is likely to result in grave injury when in the face of a clear and present danger of which the alleged tortfeasor is aware. *Elec. Boat Corp. v. Fallen*, 343 So. 3d 1218, 1220 (Fla. Dist. Ct. App. 2022). While the evidence, taken in the light most favorable to CJV, creates a dispute of material facts regarding HDR's alleged breach of contract and LoBuono's purported negligence, there is no evidence that HDR's or LoBuono's conduct constitutes gross negligence as a matter of law. (DE 62 at 19–22.)

Nevertheless, because the carve out provision includes multiple terms disjunctively, the Court shall also examine the other specified terms as they have distinct meaning. *Rudd v. State ex rel. Christian*, 310 So. 2d 295, 298 (Fla. 1975). Under Florida law, willful misconduct "involves conduct of a quasi-criminal nature, the intentional doing of something either with the knowledge that it is likely to result in serious injury or with a wanton and reckless disregard of its probable consequence." *Gregor v. McKesson & Robbins*, 54 So. 2d 682, 686 (Fla. 1951) (opining that mere negligence and even gross negligence fall short of being willful misconduct); *see also Farrell v. Fisher*, 578 So. 2d 407, 409 (Fla. Dist. Ct. App. 1991). In the same light, an "intentional act"[22] includes acts or omissions done with a conscious disregard or malice. *See* Brunner & O'Connor, Brunner & O'Connor on Construction Law § 17.146 ("The exculpatory clause was intended to narrowly exclude from protection truly culpable, harmful conduct, not ***merely intentional non-performance of the agreement motivated by financial interest.***") (emphasis added); s*ee also Allstate Ins. Co. v. Revival Chiropractic, LLC*, 385 So. 3d 107, 113 (Fla. 2024) ("Provisions in the texts of statutes and contracts cannot be viewed

---

[22] *Intentional*, Merriam-Webster Online Dictionary ("Done by intention or design.").

in isolation from the full textual context of which they are a part.  Under the whole-text canon, proper interpretation requires consideration of the entire text, in view of its structure and of the physical and logical relation of its many parts.") (quotations, citations omitted); *World Fuel Servs., Inc. v. John E. Retzner Oil Co., Inc.*, 234 F. Supp. 3d 1234, 1239 (S.D. Fla. Jan. 17, 2017) ("Contract terms must be interpreted in the context of the entire agreement and no contract term should be construed in conflict with another if possible.").[23]

In this case, CJV speculates that HDR and LoBuono deliberately breached the contract and disregarded CJV's right to notice of known engineering errors and retention of records concerning those errors.[24]  CJV cites email records where LoBuono discussed the inaccuracy of the wind loads and drag coefficients that HDR intended to include in the 60% submittals given to CJV in November and December 2018, and email correspondence where wind engineers from RWDI expressed concern about the incorrect analytics and asked LoBuono how he wished to resolve the issue.  Moreover, CJV argues that HDR generated Design Enhancement 9 in response to these discussions and opines

---

[23] It should be noted that Florida courts construe insurance contracts—contracts entered into to manage the risk of loss and damages—as a whole, viewing all words in context. *Walker v. State Farm Fire & Cas. Co.*, 758 So. 2d 1161, 1162 (Fla. Dist. Ct. App. 2000) ("Insurance contracts are to be reviewed as a whole, viewing all words in context."). Similarly, the Court finds that each specified conduct identified within the carve-out provision should be read together within context of the surrounding words and their meanings.

[24] *Cf. Ala. Aircraft Indus., Inc. v. Boeing Co.*, 2018 WL 3869556, at *21 (N.D. Ala. Aug. 15, 2018) (dismissing plaintiffs' argument that an intentional breach spoils the enforceability of a limitation of liability clause because "if accepted, [plaintiffs' argument] would render almost all limitations clauses invalid, as most contract breaches are intentional").

that this was done to circumvent the issue of the inaccurate wind loads by supplementing the design with greater valences.  This plan ultimately was unsuccessful leading to HDR's subsequent disclosure to CJV that the wind loads and drag coefficient were incorrect.

Although a reasonable jury could interpret this evidence—including Defendants' motive regarding the suboptimal Design Enhancement 9—to constitute breach of contract and/or mere negligence, the Court finds that the evidence cited does not establish gross negligence or willful misconduct as commonly understood by Florida courts.  The Parties do not disagree that Defendants' purported miscalculations arose in the preliminary design submittals, not the final construction plans for the Signature Bridge.  Indeed, once CJV identified the particular deficiencies with the wind loads and other corresponding metrics, the necessary changes were implemented. (DE 164-24 at 4; DE 164-23 at 5.) Consequently, the record does not advance factual circumstances where Defendants' acts were "most likely [to] result in injury to persons or property," which is a step above ordinary negligence's "might possibly result" requirement.[25]  *Carraway v. Revell*, 116 So. 2d 16, 22–23 (Fla. 1959).  Accordingly, because CJV provides no evidence that HDR and LoBuono deliberately engaged in a wrongful act in the face of clear and present danger likely to result in grave injury to another, the Court finds that there is no genuine issue of material fact as to HDR and its employees' intentional acts of malice or deceit as

---

[25] *See e.g., Moradiellos v. Gerelco Traffic Controls, Inc.*, 176 So. 3d 329, 335–36 (Fla. Dist. Ct. App. 2015) (holding that the defendant was not grossly negligent for failing to repair a streetlight because, although defendants "created a possibility of harm . . . . [T]hey did not create a condition in which an accident would probably and most likely occur"); *Merryman v. Mattheus*, 529 So. 2d 727, 728–29 (Fla. Dist. Ct. App. 1988) (finding that defendant's operation and use of a malfunctioning crane did not constitute gross negligence because there was "no more than a possibility" of danger).

contemplated by the language of the carve-out provision.  The Court concludes that summary judgment is appropriate as it relates to the limitation of liability provision, and CJV's damages related to its breach of contract claim against HDR and negligence claim against LoBuono are capped at the $10,000,000 policy limit of the PSPL Policy. *See Diesel "Repower", Inc. v. Islander Invs. Ltd.*, 271 F.3d 1318, 1324 (11th Cir. 2001) (enforcing parties' limitation of liability provision within a federal maritime context where the parties are of equal bargaining power and the terms are clear and unequivocal of the parties' intent); *see also* Restatement (Second) of Contracts § 574 cmt. a ("Exculpatory clauses . . . are enforceable where, and to the extent that, such intention was made clear and unequivocal in the contract.").

Despite the limitation of liability's clear language establishing that CJV's damages against HDR and its respective "directors, officers and employees" shall be limited to the PSPL Policy, CJV attempts to argue that the limitation of liability provision should not apply to LoBuono in light of Florida Statutes Section 558.0035 and public policy. However, based on a careful review of the record and Florida law, the Court finds that CJV misapprehends this statutory authority as it institutes certain requirements for exclusions of liability for design professionals, not limitations of liability.  The statute addresses whether professional engineers can contract out of liability altogether; but the relevant contractual provision at issue in this case relates to the extent of LoBuono's liability in damages, not whether he can be found liable at all.  Moreover, in assessing limitations of liability contracts, Florida courts give deference to sophisticated parties who negotiate and arrive at a meeting of the minds on certain liability limitations.  *See e.g., Hernandez v. Crespo*, 211 So. 3d 19, 26 (Fla. 2016) ("Because we hold the freedom to

contract in high regard, we carefully weigh the right to freely contact against the legislative intent and the public policy it seeks to enact."); *Keystone Airpark Auth. v. Pipeline Contractors, Inc.*, 266 So. 3d 1219, 1224 (Fla. Dist. Ct. App. 2019) (concluding that there is no public policy that prohibits sophisticated parties from negotiating a contract that limits liability for consequential damages). Here, the record reveals that the Parties—experienced businesses guided by capable legal counsel—engaged in substantial communication about the terms of the contract including the limitation of liability provision and the carve-out provision. Therefore, the Court will not set aside the clear terms established by the Parties' mutually agreed upon contract.

## IV.  CONCLUSION

Accordingly, upon review of the Motion, the record, and applicable law, it is **ORDERED AND ADJUDGED** as follows:

1.  Defendant HDR Engineering, Inc.'s Motion for Partial Summary Judgment (DE 143) is **GRANTED**.

2.  Defendant Joseph LoBuono's Motion for Summary Judgment (DE 163) is **GRANTED IN PART AND DENIED IN PART**.

3.  Trial is **RESET** to begin on the Court's two-week trial calendar starting **January 27, 2025 at 9:00 a.m.** and Calendar Call is **RESET** to **January 21, 2025 at 11:00 a.m.**

4.  **WITHIN FIVE (5) DAYS** of the date of this Order, the Parties shall file their proposed jury instructions and a proposed verdict form.

**DONE AND ORDERED** in Chambers in Miami, Florida on this 9th day of January, 2025.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE